1
2
3
4
5
6                        IN THE UNITED STATES DISTRICT COURT

7                           FOR THE DISTRICT OF ARIZONA

8

9   CYNTHIA G. YACKS,                    )
                                         )      NO.    CV 07-280-TUC-RCC (BPV)
10              Plaintiff,                )
                                         )
11       vs.                             )      **REPORT AND RECOMMENDATION**
                                         )
12  MICHAEL J. ASTRUE, Commissioner of)
    Social Security,                     )
13                                       )
                Defendant.               )
14  _____ )

15          Plaintiff filed this action for review of the final decision of the Commissioner for

16  Social Security pursuant to 42 U.S.C. §§ 405(g).  The case has been referred to the United

17  States Magistrate Judge pursuant to the Rules of Practice of this Court.

18          Pending before the Court is a Motion for Summary Judgment filed by Plaintiff on

19  January 15, 2008 (Doc. No. 10), a Responsive Brief in Opposition to Plaintiff's Motion for

20  Summary Judgment (Doc. No. 13) filed by Defendant on February 12, 2008, and a Reply to

21  Defendant's Responsive Brief in Opposition to Plaintiff's Motion for Summary Judgment

22  (Doc. No. 17), filed on March 31, 2008.  For the following reasons, the Magistrate Judge

23  recommends that the ALJ's decision be reversed and the matter remanded for further

24  proceedings consistent with this report.

25  **I.    PROCEDURAL HISTORY**

26          Plaintiff filed an Application for Social Security Disability Insurance Benefits

27  ("SSDIB") under Title II of the Social Security Act ("SSA") on December 10, 2003, alleging

28  that she had suffered from a disability since August 2003. (Transcript/Administrative Record

("Tr.") 65-67)  Plaintiff alleged she was disabled due to injuries suffered in an industrial incident in 2003, which resulted in a head and neck injury, neck and back pain, and the inability to hold objects.  (Tr. 75)

The Social Security Administration (SSA) denied Plaintiff's Application initially, and on reconsideration. (Tr. 37-43, 49-51) Plaintiff requested review (Tr. 52) and on September 19, 2005, appeared with counsel, and testified at a hearing before Administrative Law Judge ("ALJ") Milan Dostal. (Tr. 305-352). Michael Yacks, Plaintiff's husband, and a vocational expert, also testified at the hearing. (Tr. 28-32 )  The ALJ found Plaintiff was not disabled. (Tr. 18-29) Plaintiff requested review of the decision by the Social Security Administration's Appeals Council. (Tr. 14)  The Appeals Council denied review on April 19, 2007, making the decision of the ALJ the final decision of the Commissioner. (Tr. 5-7)  *See* 20 C.F.R. §§ 404.981.  Plaintiff timely filed the instant Complaint in U.S. District Court appealing the Commissioner's final decision (Doc. No. 1).

## II.   THE COMMISSIONER'S DECISION AND EVIDENCE PRESENTED

### A.   Plaintiff's Education and Work History

Plaintiff was born on November 30, 1961, and was forty-four years old on the ALJ's decision date. (Tr. 21, 65)   She obtained a GED and completed about a year and a half of college.  (Tr. 81, 310)  Plaintiff's past relevant work consists of floor sales at Wal-Mart, nurses aid in a nursing home, bartending and waitressing, floor sales at Home Depot, cashiering and managing at a store and gas station, sales in a women's clothing store, and working for Washington Mutual as a home loan clerk.  (Tr. 76)

### B.   Plaintiff's Testimony

On September 19, 2005, Plaintiff appeared before ALJ Dostal, with an attorney representative. (Tr. 305-52)  Exhibits 1A -10F were admitted into evidence.  (Tr. 307) Plaintiff testified that the last work she did was as at Home Depot in the design center.  (Tr. 312) Plaintiff did not have to lift anything more than 20 pounds at Home Depot by herself. (Tr. 313) Prior to Home Depot, Plaintiff worked at Washington Mutual for a few months working with customers directly "straightening out" home loans on the phone.  (Tr. 313)

Prior to that she managed gas stations acting as cashier/manager. (Tr. 315)  Before that, she worked in a consignment clothing store marking and selling clothes. (Tr. 317)

Plaintiff testified that she has pain in her upper back mostly, down her arms, and then in the last year, in her hips and lower back. (Tr. 320) Plaintiff testified that on a daily basis she takes her medications, gets out of bed to use the bathroom, and gets back in bed and watches six or seven hours of TV a day. (Tr. 322) She approximates that she spends 22-24 hours a day in her room on her bed. (Tr. 324)  She doesn't drive and turned in her driver's license when she couldn't turn her head all the way to the left or right. (Tr. 322)  Plaintiff has tried cooking, uses a microwave on occasion, but does not dust, sweep, or mop because it hurts and her arms go numb, and she can't stand for that long. (Tr. 322) She experiences her back hurting, throbbing, and spasms, then her arms go numb within a few swipes of the broom, so she returns to rest. (Tr. 324)  Her friend comes to her room to visit. (Tr. 323)

Plaintiff testified that she is depressed and feels useless because she can't do anything anymore. (Tr. 323) She used to do miniature wax coverings and small bead work but can't do it anymore. (Tr. 323) Her fingertips on her right hand are constantly numb, and if she holds them a certain way, they go totally numb, cold, and she gets sharp electrifying and burning pain down her arm. (Tr. 325) She also drops things. (Tr. 325)

Plaintiff testified that a surgeon told her that it would be pointless to have surgery on her vertebra because the discs above and below the problem area would deteriorate anyway. (Tr. 325) Plaintiff testified that she has pain in her hips and her legs get tingly and numb, with pain down to the back of her knee, but not real bad. (Tr. 325-36)

Plaintiff testified that her medications help her get out of bed, but not for too long. (Tr. 326) As a side effect she experiences dizziness, and is sleepy and tired, but has not had any nausea. (Tr. 326)

Michael Yacks, Plaintiff's husband, testified at the hearing. (Tr. 332) Mr. Yacks testified that a typical day for Plaintiff is spending most of the day in bed sleeping. (Tr. 333) Mr. Yacks testified that Plaintiff gets depressed, tries to do things, but ends up in pain or not being able to grip anything because of the numbness in her arms and fingers. (Tr. 333) Mr.

1   Yacks calls Plaintiff throughout the day to make sure she's okay, and she usually answers.

2   (Tr. 333) Because she doesn't cook, he usually cooks, or they get fast food, but Plaintiff can't

3   sit in a restaurant.  (Tr. 333-34) Mr. Yack washes and braids her hair because Plaintiff can't

4   keep her arms up.  (Tr. 334)

5       Ruth Van Fleet, a vocational expert, testified in response to questions asked by the

6   ALJ.  (Tr. 336) Ms. Van Fleet provided the exertional and skill level involved in Plaintiff's

7   past employment as a nurses aide  - medium exertion level, semi-skilled, and with the job

8   specific requirement of lifting up to 100 pounds (which would increase the exertion level to

9   heavy or very heavy); floor sales at Wal-Mart - light exertion level, semi-skilled; bartending

10  and waitressing - light exertion level, semiskilled work, with the job specific requirement of

11  lifting up to 50 pounds (which would increase the exertion level to medium); Home Depot -

12  light exertion level, semiskilled to skilled; and cashier at gas station - light exertion level,

13  semiskilled to skilled, her job specific requirement working at Exxon required lifting 100

14  pounds would increase the exertion level to very heavy; and Washington Mutual Home

15  Loans by phone, sedentary exertion level, semi-skilled.

16      Ms. Van Fleet was presented with the following hypothetical by the ALJ:   "...a

17  women who is 43 years of age and has one-and-a-half years of college education and has had

18  the work experience and the educational background that the Claimant ... has. ... [S]he would

19  be only able to lift frequently 10 pounds and 20 pounds on an occasion.  And she would be

20  able to sit only about six hours during the workday with normal breaks.  She would also need

21  those normal breaks with respect to any walking or standing. ... [T]his hypothetical person

22  can only occasionally climb, occasionally balance, occasionally stoop, occasionally kneel,

23  and should avoid crawling.  She has problems with her arms so she should avoid working

24  above shoulder heights.  She should also avoid working at unprotected heights ... particularly

25  ladders, ropes, or scaffolds and on or in moving machinery that would cause a hazard to

26  herself or others. ...[She] has some breathing problems so she should avoid working at places

27  where there are excessive amounts of gas, dust, and fumes. [She] ... has pain in various parts

28  of her body, including her head, her neck, her back, her arms and hips with occasionally

1    tingling numbness in both her fingers and legs. ... [Her] pain level is of a slight nature and

2    has a slight effect on her ability to do basic work activities or that condition is or can be

3    controlled by appropriate medication without significant adverse side effects. ... [She] also

4    has some occasional dizziness and tiredness probably due to the medication but it would have

5    a slight effect on her ability to do basic work activities or it could be controlled by

6    appropriate medication without significant adverse side effects. ... [She] also has some mental

7    problems in the form of depression and anxiety with some decrease in memory, which would

8    have a slight effect on her ability to do basic work activities, or that condition is or could be

9    controlled by appropriate medication without significant adverse side effects.  Based on that

10   hypothetical, could that hypothetical person with all those problems be able to do any of the

11   past work that was done by Claimant?"  (Tr. 341-42) Ms. Fan Fleet responded that the

12   hypothetical person could return to the position such as the design center in Home Depot, or

13   Walmart. (Tr. 342-43)   Additionally, if the numbness in her hands would not be such that

14   she'd still be able to perform working home loans by phone, then she could probably return

15   to a position such as that.  (Tr. 343)

16        The ALJ then proposed a second hypothetical, with all the same factors, except "the

17   pain is more severe.  And it would be normally of a moderate nature and would normally

18   have a moderate effect on her ability to do basic work activities.  However, that condition is

19   or still can be controlled by appropriate medication without significant adverse side effects.

20   So could hypothetical person number two with moderate with controlled pain be able to do

21   the work that was done as the design center clerk?" (Tr. 343-44)  Ms.  Van Fleet responded

22   affirmatively.  (Tr. 344)

23        The ALJ then proposed a third hypothetical, with all factors of the first hypothetical,

24   except "now the pain is severe.  The pain is so severe that there is no amount of pain

25   medication that'll help alleviate that pain.  Or if it does alleviate the pain, then the side effects

26   of the pain medication are so significantly adverse that they would markedly interfere with

27   ability to maintain pace and concentration.  So could hypothetical person number three, with

28   severe  uncontrolled  pain,  be  able  to  do  any  of  the  past  work  that  was  done  by  the

1   Claimant...?" (Tr. 344) Ms. Van Fleet responded that she would probably be able to secure
2   a job but wouldn't be able to maintain so it wouldn't be in a competitive environment. (Tr.
3   345)

4   The ALJ then asked if that was the case, if there were any other kind of work in the
5   national economy that this hypothetical person could do? (Tr. 345) Ms. Van Fleet responded
6   negatively. (Tr. 345)

7   Plaintiff's attorney proposed a fourth hypothetical, assuming the hypothetical person
8   "has severe stenosis in her neck and that as a result of that it causes her to have numbness in
9   her fingers to where even before she had an industrial accident, she had to give up a job
10   because she could not hold the phone or use the phone in any type of a constant manner or
11   use a keyboard in any type of repetitive manner.  And further that she has a problem with
12   muscle lumbar spasm in her back ...[that] various doctors have had found neck spasm, that
13   she continues to have these problems unless she is taking medication and that she is on
14   Oxycodone, methadone, Percocet – or OxyContin, methadone, Percocet, and at times
15   Demerol.  She also has, as a result of these, she gets ... very fatigued and sleepy.  Assuming
16   those facts, is there any way she can keep any job on a competitive labor market?" (Tr. 346)
17   Ms. Van Fleet stated that the hypothetical person would not be able to maintain work in a
18   competitive labor market. (Tr. 346)

19   Plaintiff's attorney further asked if the hypothetical person has "[m]uscle spasm that
20   affects her legs and gives her numbness in her legs, makes it difficult for her to sit for long
21   periods or to stand or any type of length of time.... [I]f she sits for any longer than a half hour
22   or 45 minutes, she usually has to go lay down because she's in muscle spasm pain and having
23   numbness down her legs and that her most comfortable position is reclining.  Assuming that,
24   would there be any jobs on a competitive labor market?"  The ALJ clarified that this
25   hypothetical included the same factors as hypothetical four except she could only sit and
26   stand for 45 minutes at a time and then has to lie down for 45 minutes. (Tr. 347-48) Ms. Van
27   Fleet responded that she couldn't do any of her past work and she couldn't do any other jobs
28   because that would need to be a selective position based on those limitations. (Tr. 348)

1     Ms. Van Fleet further opined that a slight cognitive limitation would not affect her

2   ability to get or keep work.  (Tr. 349) Ms. Van Fleet also agreed that dropping items on an

3   ongoing basis would cause a problem with her ability to perform Plaintiff's previous jobs,

4   and would affect her ability to get any jobs in the labor economy.  (Tr. 349-50)

5           C.      Plaintiff's Medical History - Physical Impairment

6      On August 18, 2003, Plaintiff was examined at El Dorado Hospital's Emergency

7   Department presenting complaints of back pain and arm numbness following heavy lifting

8   at work.  (Tr. 161, 163) An MRI was performed on Plaintiff for clinical indications of

9   bilateral arm numbness and pain for greater than one year, getting progressively worse.  The

10  MRI showed moderate to severe central spinal stenosis at C6-C7 with severe compromise

11  to the left neural foramen and moderate compromise to the right neural foramen secondary

12  to posterior ridging.  (Tr. 166) The examining doctor noted a clinical impression of an acute

13  herniated disk at C6-C7.  (Tr. 162)

14      On August 23, 2003, after returning to work, Plaintiff was again seen at El Doroado

15  Hospital's Emergency Department reporting a re-injury with complaints of neck, back, arm

16  and leg pain. (Tr. 158)  The examining doctor's clinical impression, after reviewing the MRI

17  taken previously, was an acute herniated disc.

18      Jack Dunn, M.D., conducted a Neurosurgical Evaluation on Plaintiff, on December

19  17, 2003.  (Tr. 172) Dr. Dunn's report indicates that Plaintiff had initially injured herself on

20  July 28, 2003, at work, then re-injured herself on August 21.  Dr. Dunn's examination

21  revealed a "decreased range of motion and neck spasm, hypersensitivity in the posterior

22  cervical area and the instrascapular area. ... Tinel's sign over the brachial plexus and the

23  axillary plexus ... decreased but present reflexes in all four extremities. ...No clonus, no

24  Babinski. [with] give-way so it's difficult to get a good assessment of her normal strength

25  and her normal sensation is not reliable.  She complains of the pain and dysesthesias going

26  into all five fingers on both hands now.  She is able to stand and balance.  Negative Romberg

27  but she has trouble balancing on her tiptoes."  (Tr. 172-73) Dr. Dunn recommended a collar

28  when she is active and a swimming exercise program, with re-evaluation in six weeks.  (Tr.

173)

On December 31, 2003, Plaintiff was assessed with chronic pain at the Carondelet Medical Group. Paul G. Koss, M.D., with Carondelet Medical Group, submitted a letter to Plaintiff's attorney, opining that his examination revealed mild right hand grip weakness, with concerns that Plaintiff might have cervical radiculopathy and possibly cervical stenosis. Dr. Koss recommended further neurological or neurosurgical evaluation, and prescribed Non-steroidal anti-inflammatory medication and a narcotic analgesic. (Tr. 179) Dr. Koss opined that Plaintiff has been unable to work in any capacity since her work related injuries in June and August 2003, that she had sustained exacerbation of spondylosis of the cervical spine that resulted in neck pain, which radiated to the arms and hands as well as paresthesias in the right hand. (Tr. 179)

After presenting to the El Dorado's emergency room on January 20, 2003, complaining of shooting pain, worse with certain positions of her neck, Plaintiff was discharged with a diagnosis of radiculopathy. (Tr. 166-168) Plaintiff was prescribed Percocet, Motrin, and Norflex. (Tr. 168)

Lloyd S. Anderson, M.D., completed an Independent Medical Exam of Plaintiff. (Tr. 216) Dr. Anderson conducted a physical exam and reviewed Plaintiff's medical records. Dr. Anderson concluded that Plaintiff had recovered from her industrial accident, but the continuation of symptoms following her injury was most likely due to severe spinal stenosis at C6-7, secondary to advanced degenerative changes at that level which antedated the industrial injury. (Tr. 215-16) Dr. Anderson opined that Plaintiff's cervical spondylosis and spinal stenosis at C6-7 prevents her from returning to heavy manual labor or activities, which involve significant or repetitive movements of the head or neck, or working above the shoulder or head level, and that she may require surgical decompression at the C6-7 level. (Tr. 216)

Plaintiff was treated by Darrell Jessop, M.D., who specializes in family practice and pain management, from May 2004 to August 2005 (Tr. 23-295) Dr. Jessop initially assessed Plaintiff with cervical radiculopathy; secondary to central spinal stenosis and neuroforaminal

1   stenosis, depression, left TMJ syndrome, and degenerative disc disease C-spine, and

2   prescribed Oxycontin, Methadone, Percocet, and Temazepam for pain, nighttime pain,

3   breakthrough pain, and insomnia.  (Tr. 294-95)

4        At Plaintiff's first month follow-up examination with Dr. Jessop, Dr. Jessop reported

5   that pain control had been generally effective, sleep quality was adequate, and Plaintiff

6   denied side effects from the medication.  (Tr. 289) In July, 2004, Plaintiff reported more

7   breakthrough pain, and Dr. Jessop adjusted her pain medications accordingly.  (Tr. 284) In

8   August, 2004, Plaintiff reported complaints of parasthesias in both legs down to the distal

9   extremities, and that her depression had been worsening over the course of the last three

10  week. (Tr. 278) In September, 2004, Plaintiff reported that she had been experiencing sharp

11  pains in the right shoulder and right hip, which Dr. Jessop believed to be degenerative in

12  etiology, and increased her dosage of Oxycontin.  (Tr. 274)   In October, Plaintiff reported

13  intermittent tarsalgia bilaterally, and that she was still having considerable pain at night and

14  in the late afternoon.  (Tr. 270) Dr. Jessop again increased the dosage of her Oxycontin

15  prescription, and adjusted her medications for insomnia. (Tr. 270) In January, 2005, Plaintiff

16  reported pain in the left and right knee and pain in her hips.  (Tr. 255) Dr. Jessop considered

17  the possibility of degenerative changes, but could not confirm the diagnosis with an x-ray

18  investigation because Plaintiff was without insurance and could not afford to pay for an x-

19  ray.  (Tr. 255)  Dr. Jessop again increased her Oxycontin dosage, and began Plaintiff on

20  Demerol, Medrol and Phenergan for pain, inflammation, and nausea. (Tr. 255) In February,

21  2005, Dr. Jessop noted that Plantiff was "quite stiff with ambulation; it is particularly

22  difficult for her to get started in the morning."  (Tr. 250) Dr. Jessop increased her dosage of

23  Oxycontin, although he noted that he was "getting close to the point where I am beginning

24  to feel uneasy about the dose of medication..." but that a "titration today may be in order."

25  (Tr. 250) In August, 2005 Plaintiff reported continued significant intervals of pain at night.

26  (Tr. 224) Dr. Jessop was reluctant to titrate her Oxycontin dosage any further, instead

27  increasing her evening dosage of Methadone.  (Tr. 224)

28        On October 18, 2005, Dr. Jessop submitted a letter to Plaintiff's attorney regarding

his management of Plaintiff's chronic pain.  (Tr. 297) He noted the diagnosis as listed previously, and, in addition tarsalgia, hypertension, hyperlipidemia, and chronic hip pain secondary to osteoarthritic degeneration.  (Tr. 297) Dr. Jessop provided his subjective assessment of Plaintiff, noting that as a result of degenerative processes in the neck, Plaintiff experiences numbness and weakness in the arms and hands, with symptoms worsened with abduction of the upper extremities over the head.  (Tr. 297) Dr. Jessop noted that her grip strength and fine motor control was also compromised, making self-care activities extremely difficult.  (Tr. 297) Dr. Jesson reported that Plaintiff had also been experiencing radiating lower back pain, extending into the posterior aspect of both legs to the ankles when severe, although Dr. Jessop noted that no radiological tests had been performed to determine the cause of this pain.  (Tr. 297) Dr. Jessop summarized Plaintiff's functional capacity as follows:

> ...personal care is limited.  The patient cannot nor should not lift anything over two or three pounds and even this should be limited to only a few times a day.  She has been advised not to drive, climb, work around machinery or work in high places.  Any repetitive activities involving the upper arms and extremities should be avoided.  She is unable to sit or stand for more than 15 minutes at a time.  Changes in position would be required to prevent muscular spasm.
>
> Cognitive capacity and concentration may be limited and/or compromised as a result of her medications.

(Tr. 298)

Dr. Jessop's overall assessment was that Plaintiff was "effectively disabled and is incapable of performing any meaningful and employable work.  She will most likely remain on a medical regimen for her pain which would also limit her employability in terms of the intolerance of controlled substances in the workplace."  (Tr. 299)

Plaintiff was evaluated by a Disability Determinations Services doctor, Randy Soo Hoo, M.D., on November 1, 2004.  Dr. Soo Hoo, noting that radiographs of Plaintiff had been requested but were still pending, concluded that Plaintiff was capable of the following

work-related activities:

> Lift/carry 20 pounds occasionally and 10 pounds frequently.  Stand/walk at least six hours per an eight-hour workday.  Sit at least six hours per an eight-hour workday.  Climb ramps and stairs, never ladders, ropes and scaffolding.  No restrictions are noted for balancing and crouching.  She can occasionally stoop, kneel and never crawl.  She can reach in all directions except for overhead.  No restrictions for handling, fingering and feeling.  There are no restrictions noted for hearing, seeing, and speaking.

(Tr. 183)

On November 29, 2004, Plaintiff was evaluated by David Mullon, M.D. (Tr. 39, 186-193) Dr. Mullon reviewed Plaintiff's medical records from Dr. Koss, and El Dorado Hospital, and concluded that Plaintiff could lift and/or carry 20 pounds occasionally, 10 pounds frequently; stand and/ or walk and sit with normal breaks for 6 hours in an 8-hour workday; she could climb, balance, stoop, kneel, crouch and crawl occasionally, but could never climb a ladder, rope or scaffolds.  (Tr. 187-188) No manipulative limitations were established with the exception of limited reaching in all direction and "frequent" overhead lifting. (Tr. 189) No other limitations were noted except for avoiding concentrated exposure of fumes, odors, dusts, gases, and poor ventilation, and hazards such as machinery, heights, etc.  (Tr. 189-90) Dr. Mullon concluded that Plaintiff's symptoms were attributable to a medically determinable impairment, but that the severity or duration of the symptoms were disproportionate to the expected severity or expected duration on the basis of Plaintiff's medically determinable impairments.  (Tr. 191)

**D.     Plaintiff's Medical History - Mental Impairment**

On December 1, 2004, Plaintiff's mental status was evaluated by Paul Tangeman, Ph.D. (Tr. 194-207) Dr. Tangeman, a psychologist, concluded that Plaintiff had no medically determinable psychological impairment, and that no further development was necessary. (Tr. 194)

**E.     Lay Testimony**

Plaintiff's husband, Michael Yacks, submitted an affidavit stating that his wife has tried to take less medication and she was in such severe pain she was crying due to the pain

in her neck and back going down her arms and legs, and that if she takes the medication she sleeps much of the time, and if she doesn't take the medication, she doesn't sleep but is in such pain that she cannot function.  (Tr. 153-54)

F.    The Commissioner's Decision

On March 23, 2006, the ALJ made the following findings:

1.    The claimant meets the nondisability requirements for a period of disability and Disability Insurance benefits set forth in section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2.    The claimant has not engaged in substantial gainful since the alleged onset of disability.

3.    The claimant's back pain, neck pain, hip pain, TMJ syndrome, hypertension, hyperlipidemia, and depression/anxiety impairments are considered "severe" based on the requirements in the Regulations 20 CFR § 404.1520(c)).

4.    These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.    The [ALJ] finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6.    Based upon a careful examination of the medical evidence, the testimony of the claimant and all the other evidence in the record, the [ALJ] finds that the claimant retains the following residual functional capacity on a routine and sustained basis to: occasionally lift and carry up to 20 pounds and frequently lift and carry 10 pounds; sit, stand, and walk for 6 hours in an 8-hour workday with normal breaks; occasionally climb, balance, stoop, and kneel; avoid crawling; avoid climbing ladder/rope/scaffolds; avoid work above shoulder heights; avoid work at unprotected heights and around moving machinery; and avoid work with excessive dust, fumes, gases.  The claimant has pain in various parts of her body including her head, neck, back, arms (with occasional tingling/numbness on fingers), and hips, which is of moderate-level and would normally have a moderate effect on her ability to do work-related activities; however, that pain is controlled by appropriate medication without any significant adverse side effects.  The claimant also has occasional tiredness, which has a slight effect on her ability to do work-related activities.  The claimant has depression and anxiety with decrease in memory, which have a slight effect on her ability to do basic work-related activities.

7.    The claimant's past relevant work as a floor salesperson, design center clerk, and home loan clerk did not require the performance of work-related activities precluded by her residual functional capacity (20 CFR § 404.1565).

8.    The claimant's medically determinable impairments do not prevent the claimant from performing her past relevant work as a floor salesperson, design center clerk, and home loan clerk.  This finding is based upon vocational expert evidence.

9.    The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision (20 CFR § 404.1520(f)).

- 12 -

(Tr. 30-31)

The ALJ noted that, although Plaintiff has medically determinable impairments that could be expected to result in her alleged symptoms and functional limitations, the "medical evidence and other evidence in the record do not entirely substantiate the intensity and persistence of symptoms as alleged by the claimant, nor by the effect her impairments have on her ability to perform work-related activities." (Tr. 23)

The ALJ noted that in terms of functional status related to her mental impairments, the evidence showed a slight restriction of activities of daily living, slight difficulties in maintaining social functioning, and slight difficulties in maintaining concentration, persistence and pace. (Tr. 23)

The ALJ commented that Dr. Jessop's treatment notes from May 2004 through August 2005 indicated that throughout her treatment, Plaintiff's pain control was "generally effective" on her analgesic regimen; that she had no side effects from her medications; and that she was satisfied with her current treatment. She constantly appeared well-groomed and in mild distress, and her gait was entirely normal requiring no assistive device. Her sleep quality was adequate and bowel function was normal. Her daily physical functioning was adequate, and her mental status was normal. Plaintiff was treated in the emergency room on August 19, 2003 for upper back and right upper extremity pain secondary to a work-related injury in July 2003. The attending physician noted that the claimant's quality and severity of pain was dull and moderate. On August 23, 2003, when she was seen again at the emergency room with complaints of pain, it was noted that she was still working, and was prescribed pain medication and discharged in stable condition. (Tr. 23) The ALJ indicated that Dr. Jessop noted that Plaintiff had a great deal of improvement in her overall pain level and functionality, and that she was responding by increasing her physical activity level substantially. (Tr. 24-25)

The ALJ gave no weight to Dr. Jessop's opinion in a letter dated October 18, 2005, that she was disabled and unable to work due to her conditions. (Tr. 25) The ALJ rejected the opinion as conclusory and unsupported by the medical evidence of record, and also noted

1  that the letter appeared to contain inconsistencies, which rendered his opinion less

2  persuasive. (Tr. 25)

3       The ALJ found Plaintiff's testimony as to the severity of her pain and limitations to

4  be "extreme as to appear implausible." (Tr. 25) Noting that Plaintiff's husband testified

5  similar to the Plaintiff, the ALJ found the allegations of pain and side effects from her

6  medication, as well as her severe depression to be inconsistent with the treatment records,

7  and that her allegations were considered not fully credible. (Tr. 25-26) The ALJ noted that

8  Plaintiff's reported limited daily activities are considered to be outweighed by the other facts

9  previously discussed, that she has received treatment for her allegedly disabling impairment,

10 but that it had been essentially routine and/or conservative in nature, and that Plaintiff had

11 been generally successful in controlling her symptoms. (Tr. 26) Additionally, although

12 Plaintiff testified that she had side effects from the use of her medications, the treatment

13 records did not support this finding. (Tr. 26)

14      The ALJ also found the residual functional capacity conclusions reached by the state

15 disability doctors also supported a finding of "not disabled", although they were non-

16 examining, and their opinions did not deserve as much weight as an examining or treating

17 physician. (Tr. 26) The ALJ also found that the opinions of Drs. Dunn, Anderson and Soo

18 Hoo also supported a finding of "not disabled."

19      The ALJ found Plaintiff retained the residual functional capacity as noted in ¶ 6,

20 *supra.* (Tr. 26) Relying on the vocational expert's testimony, the ALJ found that the

21 Plaintiff was capable of performing her past relevant work as a floor salesperson, design

22 center clerk, and home loan clerk, and therefore was not under a disability as defined in the

23 Social Security Act at any time through the date of the decision. (Tr. 27-28)

24      G.    Additional Evidence Presented to the Appeals Council

25      Following the adverse decision by the ALJ, the Plaintiff submitted a letter of

26 contention, raising several errors in the ALJ's decision to the Appeals Council, however, no

27 further medical evidence was submitted. (Tr. 8, 300-304) The Appeals Council denied

28 review without comment. (Tr. 8-10)

III.   **ISSUES**

     A.    Plaintiff's Position

Plaintiff asserts that the ALJ erred by (1) rejecting Plaintiff's doctors' opinions contrary to law; (2) improperly rejecting Plaintiff's testimony as not credible; (3) posing an incomplete hypothetical to the vocational expert.  Plaintiff submits that the decision of the Commissioner should be reversed, and Plaintiff found disabled.

     B.    Defendant's Position

Defendant contends that the ALJ (1) properly assessed Plaintiff's RFC; (2) properly assessed Plaintiff's credibility; and (3) properly determined that Plaintiff did not establish that she could no longer perform her past work.

IV.   **DISCUSSION**

     A.    Standard of Review

An individual is entitled to Title II Social Security Disability Insurance benefits ("SSDIB") if the individual is insured for those benefits, has not attained retirement age, has applied for those benefits, and is disabled.  42 U.S.C. § 423(a)(1).  The definition of disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

The Ninth Circuit has stated that "'a claimant will be found disabled only if the impairment is so severe that, considering age, education, and work experience, that person cannot engage in any other kind of substantial gainful work which exists in the national economy.'"  *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993) (*quoting Marcia v. Sullivan*, 900 F.2d 172, 174 (9th Cir. 1990)).

The claimant has the burden to establish a prima facie case showing an inability to engage in previous occupations.  *Thompson v. Schweiker*, 665 F.2d 936, 939 (9th Cir. 1982).  The burden then shifts to the Commissioner  to show that other substantial work, for which the claimant is qualified, exists in the national economy.  *Id.*  (citing *Hall v. Secretary of*

1    *HEW*, 602 F.2d 1372, 1375 (9th Cir. 1979); *Cox v. Califano*, 587 F.2d 988, 990 (9th Cir.

2    1978)).

3         The court will set aside a denial of benefits only if the Commissioner's findings are

4    based on legal error or are not supported by substantial evidence in the record as a whole.

5    *Kail v. Heckler*, 722 F.2d 1496, 1497  (9th Cir. 1984) (citing *Sample v. Schweiker*, 694 F.2d

6    639, 642 (9th Cir.1982), *Thompson v. Schweiker*, 665 F.2d 936, 939 (9th Cir.1982));  42

7    U.S.C. § 405(g)).  In determining whether there is substantial evidence, the Court must

8    consider the evidence as a whole, weighing both the evidence that supports and the evidence

9    that detracts from the Commissioner's conclusion. *Jones v. Heckler*, 760 F.2d 993, 995 (9th

10   Cir. 1985).

11        Substantial evidence is "more than a scintilla," *Richardson v. Perales*, 402 U.S. 389,

12   401 (1971), but "less than a preponderance." *Sorenson v. Weinberger*, 514 F.2d 1112, 1119

13   n.10 (9th Cir. 1975); *Desrosiers v. Secretary of Health and Human Servs.*, 846 F.2d 573,

14   576 (9th Cir. 1988).  Substantial evidence is "'such relevant evidence as a reasonable mind

15   might accept as adequate to support a conclusion.'" *Richardson*, 402 U.S. at 401 (quoting

16   *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

17        The Commissioner, not the court, is charged with the duty to weigh the evidence,

18   resolve material conflicts in the evidence and determine the case accordingly.  Reviewing

19   courts must consider the evidence that supports as well as detracts from the examiner's

20   conclusion. *Day v. Weinberger*, 522 F.2d 1154, 1156 (9th Cir. 1975).  Moreover, "if the

21   evidence can support either outcome, the court may not substitute its judgment for that of the

22   ALJ." *Matney v. Sullivan*, 981 F.2d 1016,1019 (9th Cir. 1992).

23        Disability claims are evaluated pursuant to a five-step sequential process.  20 C.F.R.

24   §§404.1520, 416.920; *Baxter v. Sullivan*, 923 F.2d 1391, 1395 (9th Cir. 1991).  The first step

25   requires a determination of whether the claimant is engaged in substantial gainful activity.

26   20 C.F.R. §§ 404.1520(b).  If so, then the claimant is not disabled under the Act and benefits

27   are denied.  *Id*.  If the claimant is not engaged in substantial gainful activity, the ALJ then

28   proceeds to step two which requires a determination of whether the claimant has a medically

severe impairment or combination of impairments.  20 C.F.R. §§ 404.1520(c).  In making a

determination at step two, the ALJ uses medical evidence to consider whether the claimant's

impairment more than minimally limits or restricts the claimant's physical or mental ability

to do basic work activities.  *Id*.  If the ALJ concludes that the impairment is not severe, the

claim is denied.  *Id*.  Upon a finding of severity, the ALJ proceeds to step three which

requires a determination of whether the impairment meets or equals one of several listed

impairments that the Commissioner acknowledges are so severe as to preclude substantial

gainful activity.  20 C.F.R. §§ 404.1520(d); 20 C.F.R. Pt. 404, Subpt. P, App.1.  If the

claimant's impairment meets or equals one of the listed impairments, then the claimant is

presumed to be disabled and no further inquiry is necessary.  If a decision cannot be made

based on the claimant's then current work activity or on medical facts alone because the

claimant's impairment does not meet or equal a listed impairment, then evaluation proceeds

to the fourth step.  The fourth step requires the ALJ to consider whether the claimant has

sufficient residual functional capacity ("RFC") to perform past work.   20 C.F.R. §§

404.1520(e).  If the ALJ concludes that the claimant has RFC to perform past work, then the

claim is denied.  *Id*.  However, if the claimant cannot perform any past work due to a severe

impairment, then the ALJ must move to the fifth step, which requires consideration of the

claimant's RFC to perform other substantial gainful work in the national economy in view

of claimant's age, education, and work experience.  20 C.F.R. §§ 404.1520(f).  At step five,

in determining whether the claimant retained the ability to perform other work, the ALJ may

refer to Medical Vocational Guidelines ("grids") promulgated by the SSA.  *Desrosiers*, 846

F.2d at 576-577.  The grids are a valid basis for denying claims where they accurately

describe the claimant's abilities and limitations.  *Heckler v. Campbell*, 461 U.S. 458, 462, n.5

(1983).  However, because the grids are based on exertional or strength factors, where the

claimant has significant nonexertional limitations, the grids do not apply.  *Penny*, 2 F.3d at

958-959; *Reddick v. Chater*, 157 F.3d 715, 729 (9th Cir. 1998). Where the grids do not apply,

the ALJ must use a vocational expert in making a determination at step five.  *Desrosiers*, 846

F.2d at 580.

1       A denial of Social Security benefits will be set aside if the Commissioner fails to

2   apply proper legal standards in weighing the evidence even though the findings may be

3   supported by substantial evidence.  *Winans v. Bowen*, 853 F.2d 643, 644 (9th Cir. 1987).

4   When the ALJ has applied an incorrect legal standard in reaching a decision, we must

5   remand unless, as a matter of law, the result could not be affected.  *See NLRB v. Enterprise*

6   *Assoc.*, 429 U.S. 507, 522 n.9 (1977); *Sagebrush Rebellion, Inc. V. Hodel*, 790 F.2d 760, 765

7   (9th Cir. 1986) (agency may rely on harmless error rule only when its mistake had no bearing

8   on the substance of the decision).

9       B.    Analysis - Rejection of Treating Physician's Opinion

10      The Ninth Circuit distinguishes among the opinions of three types of physicians:  (1)

11  those who treat the claimant (treating physicians);  (2) those who examine but do not treat

12  the claimant (examining physicians);  and (3) those who neither examine nor treat the

13  claimant (nonexamining physicians).  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995), as

14  amended (Apr. 9, 1996).

15      "By rule, the Social Security Administration favors the opinion of a treating physician

16  over non-treating physicians." See *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir.2007) (citing

17  C.F.R. § 404.1527). "Generally, a treating physician's opinion carries more weight than an

18  examining physician's, and an examining physician's opinion carries more weight than a

19  reviewing physician's." *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001) (citing

20  *Lester*, 81 F.3d at 830; 20 C.F.R. § 404.1527(d).  In addition, the regulations give more

21  weight to opinions that are explained than to those that are not and more weight to the

22  opinions of specialists concerning matters relating to their specialty over that of

23  nonspecialists.  *Holohan*, 246 F.3d at 1202 (citing 20 C.F.R. §§  404.1527(d)(5) and

24  404.1527(d)(3)).  Under the regulations, if a treating physician's medical opinion is supported

25  by medically acceptable diagnostic techniques and is not inconsistent with other substantial

26  evidence in the record, the treating physician's opinion is given controlling weight.  *Id.*

27  (citing 20 C.F.R. S 404.1527(d)(2);  Social Security Ruling (SSR) 96-2p).

28      More weight is given to a treating physician's opinion than to the opinion of a

1   nontreating physician because a treating physician "is employed to cure and has a greater

2   opportunity to know and observe the patient as an individual." *Andrews v. Shalala*, 53 F.3d

3   1035, 1041 (9th Cir. 1995) (quoting *Magallanes v. Bowen*, 881 F.2d 747, 751 (quoting

4   *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987))).  "Likewise, greater weight is

5   accorded to the opinion of an examining physician than a non-examining physician."

6   *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995)(citing 20 C.F.R. § 416.927(d)(1);

7   *Pitzer v. Sullivan*, 908 F.2d 502, 506 n.4 (9th Cir. 1990).

8        The ALJ may reject the opinion of a treating physician, whether or not controverted;

9   however, the ALJ may reject an uncontroverted opinion of a treating physician only for clear

10  and convincing reasons.  *Andrews*, 53 F.3d at 1041.  To meet this burden, the ALJ must set

11  out a detailed and thorough summary of the facts and conflicting clinical evidence, state his

12  interpretation of the facts and evidence, and make findings.  *Magallanes v. Bowen*, 881 F.2d

13  747, 751 (9th Cir.  1989).  To reject the opinion of a treating physician which conflicts with

14  that of an examining physician, the ALJ must "'make findings setting forth specific,

15  legitimate reasons for doing so that are based on substantial evidence in the record.' "

16  *Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir.1987), (quoting *Sprague*, 812 F.2d at 1230);

17  see also *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir.1983)  (adopting this rule).  "The ALJ

18  can meet this burden by setting out a detailed and thorough summary of the facts and

19  conflicting clinical evidence, stating his interpretation thereof, and making findings." *Cotton*

20  *v. Bowen*, 799 F.2d 1403, 1408 (9th Cir.1986).

21       Although an ALJ is not bound by the uncontroverted opinions of a treating physician

22  on the ultimate issue of disability, the ALJ must set out clear and convincing reasons for

23  doing so.  *Reddick v. Chatter*, 157 F.3d 715, 725 (1998).  A treating physician's opinion on

24  disability, if controverted, can be rejected only with specific and legitimate reasons supported

25  by substantial evidence in the record.  *Lester*, 81 F.3d at 830.  In the absence of other

26  evidence to undermine the credibility of a medical report, the purpose for which the report

27  was obtained does not provide a legitimate basis for rejecting it.  *Reddick*.157 F.3d at 726.

28       The Social Security Adminstration has explained that an ALJ's finding that a treating

1   source medical opinion is not well-supported by medically acceptable evidence or is
2   inconsistent with substantial evidence in the record means only that the opinion is not entitled
3   to controlling weight, not that the opinion should be rejected. See *Orn*, 495 F.3d at 632
4   (citing § 404.1527). Treating source medical opinions are still entitled to deference and, in
5   many cases, will be entitled to the greatest weight and should be adopted, even if it does not
6   meet the test for controlling weight." *Orn*, 495 F.3d at 632; see also *Murray v. Heckler*, 722
7   F.2d 499, 502 (9th Cir.1983) ("If the ALJ wishes to disregard the opinion of the treating
8   physician, he or she must make findings setting forth specific, legitimate reasons for doing
9   so that are based on substantial evidence in the record.")

10          The ALJ provided two reasons for rejecting Dr. Jessop's disability opinion, that the
11   opinion was "conclusory and unsupported by the medical record" and that the letter appeared
12   to contain inconsistencies.  Although an ALJ need not accept the opinion of any physician,
13   including a treating physician, if that opinion is brief, conclusory and inadequately supported
14   by clinical findings, *see Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002), the ALJ did
15   not support her contention that Dr. Jessop's opinion was not supported by the medical record
16   with an interpretation of conflicting medical evidence supported by substantial evidence in
17   the record.

18          The ALJ, however, provided specific examples of the reported inconsistencies
19   between Dr. Jessop's disability report and his treatment notes: "For instance, throughout the
20   claimant's treatment ..., the doctor repeatedly noted that the claimant had no side effects from
21   her medications.  Yet, the doctor now indicates that the claimant has somnolence and fatigue
22   as side effects.  He even noted, throughout the claimant's treatment, that her sleep was
23   adequate.  He also indicated in the letter that the claimant's personal care was limited, that
24   she had significant physical limitations, and that her cognitive capacity/concentration was
25   limited and/or compromised as a result of her medications.  Yet, throughout her treatment,
26   there was no indication of same.  In fact the doctor repeatedly noted that the claimant's daily
27   functioning was adequate, that her gait was entirely normal requiring no assistive device, that
28   her mental status was normal, and that her physical examinations continued to remain

1    unchanged from her previous evaluations ... . It was even noted at one point that she

2    experienced a great deal of improvement in her overall pain level and functionality and was

3    responding by increasing her physical activity level substantially ... ." (Tr. 25)

4          Additionally, the ALJ opined that "the possibility always exists that a doctor may

5    express an opinion in an effort to assist a patient with whom he or she sympathizes for one

6    reason or another.  Another reality which should be mentioned is that patients can be quite

7    insistent and demanding in seeking supportive notes or reports from their physicians, who

8    might provide such a note in order to satisfy their patient's requests and avoid unnecessary

9    doctor/patient tension.  While it is difficult to confirm the presence of such motives, they are

10   more likely in situations where the opinion in question departs substantially from the rest of

11   the evidence of record, as in the current case." (Tr. 25)

12         The ALJ's concern over the possibility that Dr. Jessop's opinion might lack credibility

13   because the opinion letter was solicited by Plaintiff's attorney is not supported by the record

14   in this case.  Furthermore, "the mere fact that a medical report is provided at the request of

15   counsel or, more broadly, the purpose for which an opinion is provided, is not a legitimate

16   basis for evaluating the reliability of the report." *Reddick v. Chater*, 157 F.3d 715, 726 (9th

17   Cir. 1998); see also *Lester*, 81 F.3d at 833 ("The treating physician's continuing relationship

18   with the claimant makes him especially qualified to evaluate reports from examining doctors,

19   to integrate the medical information they provide, and to form an overall conclusion as to

20   functional capacities and limitations, as well as to prescribe or approve the overall course of

21   treatment.").  There is, however, a sufficient basis to accept the ALJ's ultimate decision to

22   reject the disability opinion as "[e]vidence of the circumstances under which the report was

23   obtained and its consistency with other records, reports, or findings could ... form a legitimate

24   basis for evaluating the reliability of the report." *Reddick v. Chater*, 157 F.3d 715, 726 (9th

25   Cir. 1998).  Where medical testimony is conflicting it is the ALJ's role to determine

26   credibility and to resolve the conflict. *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir.1982).

27   The reasons given are specific and legitimate, and supported by substantial evidence, as the

28   ALJ pointed to concrete examples of inconsistencies between the letter and Dr. Jessop's own

1    treatment notes.  Thus, the ALJ did not err in rejecting Dr. Jessop's ultimate opinion that

2    Plaintiff was disabled and unable to work due to her condition.

3        C.    Plaintiff's Credibility

4        "An ALJ is not required to believe every allegation of disabling pain or other

5    nonexertional impairment." *Orn v. Astrue*, 495 F.3d 625, 635 (9th Cir. 2007) (internal

6    quotation marks and citation omitted).  When a medical impairment has been established,

7    however,  the ALJ must provide "specific, cogent reasons for the disbelief" and may not

8    discredit a claimant's testimony as to subjective symptoms merely because they are

9    unsupported by objective evidence. *Lester*, 81 F.3d at 834.  While an ALJ is responsible for

10   determining the credibility of a claimant, an ALJ cannot reject a claimant's testimony without

11   giving clear and convincing reasons. *Holohon v. Massanari,* 246 F.3d 1195, 1208 (9th Cir.

12   2001) (citing *Reddick*, 157 F.3d at 722.)  In addition, the ALJ must specifically identify the

13   testimony she or he finds not to be credible and must explain what evidence undermines the

14   testimony. *Id*.  The findings made in rejecting the pain complaints must be specific to provide

15   the court enough information to determine that the ALJ did not reject the claim arbitrarily,

16   but based his decision on permissible factors. *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir.

17   1995); *Bunnell v. Sullivan*, 947 F.2d 341, 345- 46 (9th Cir.1991) (en banc ). The evidence

18   upon which the ALJ relies must be substantial.  *Id*.  In assessing the claimant's credibility,

19   the ALJ may consider ordinary techniques of credibility evaluation, such as the claimant's

20   reputation for lying, prior inconsistent statements about the symptoms, and other testimony

21   from the claimant that appears less than candid; unexplained or inadequately explained

22   failure to seek or follow a prescribed course of treatment; the claimant's daily activities; the

23   claimant's work record; observations of treating and examining physicians and other third

24   parties; precipitating and aggravating factors; and functional restrictions caused by the

25   symptoms. *Smolen*, 80 F.3d at 1284. *See also Robbins*, 466 F.3d at 884 ("To find the

26   claimant not credible, the ALJ must rely either on reasons unrelated to the subjective

27   testimony (*e.g.*, reputation for dishonesty), on conflicts between his testimony and his own

28   conduct; or internal contradictions in that testimony.")

1          D.    Analysis - Plaintiff's Credibility

2          The ALJ concluded that the Plaintiff has medically determinable impairments that

3    could be expected to result in her alleged symptoms and functional limitations (Tr. 23), but

4    stated the following reasons for rejecting the Plaintiff's testimony regarding the severity of

5    her pain and limitations (Tr. 25-26).

6          1.    *Daily Activities*

7          The ALJ rejected Plaintiff's testimony regarding her limitation in daily activities to

8    be "outweighed by the other factors discussed in this decision." (Tr. 26)  The ALJ provided

9    no examples of what other evidence would outweigh Plaintiff's testimony, and, as there was

10   no evidence of malingering, the ALJ failed to specifically identify the testimony she finds

11   not to be credible and specifying what evidence undermines the testimony. *Hollohan, supra.*

12   Thus, this Court finds that the ALJ's reasons for rejecting Plaintiff's testimony is not

13   supported by clear and convincing evidence as to her daily activities.

14          2.    *Treatment history*

15          The ALJ noted that the second reason for rejecting the Plaintiff's allegations was that

16   Plaintiff's treatment had been "essentially routine and/or conservative in nature, and has been

17   generally successful in controlling her symptoms [as noted previously in the ALJ's opinion]."

18   An ALJ may permissibly infer that pain is not as limiting as reported when there is evidence

19   of minimal or conservative treatment.  *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (2008)

20   (citing *Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999); *Parra v. Astrue*, 481 F.3d 742,

21   750-51 (9th Cir. 2007)).

22          Although an unexplained or inadequately explained failure to seek treatment may be

23   the basis for an adverse credibility finding, a claimant's failure to receive medical treatment

24   during the period when the claimant had no medical insurance cannot support an adverse

25   credibility finding.   *Orn v. Astrue*, 495 F.3d 625, 638 (9th Cir. 2007).

26          Initially, Dr. Jessop, Plaintiff's treating physician, mentioned that it might be "quite

27   possible that neural blockade or other such interventions may be of benefit...however, these

28   are not possible at this time as the patient cannot afford them and she has no insurance." (Tr.

295)   After Dr. Jessop began treatment of Plaintiff with pain medications, he noted that Plaintiff "continues to do well on their current analgesic regimen" and did not refer Plaintiff for further diagnostics and/or consults.  (Tr. 224-25, )

Upon review of the records, Dr. Jessop's in particular, despite his initial consideration of the use of a neural blockade, there was no recommendation that Plaintiff would have benefitted from more aggressive treatment, and no indication that Plaintiff could not avail herself of recommended interventions due to lack of insurance.  Although one examining doctor had reported that Plaintiff might require surgical decompression at the C6-7 level (Tr. 216), Dr. Dunn, who saw Plaintiff for a Neurosurgical Evaluation, considered Plaintiff's degenerative disease and foraminal and central stenosis, and recommended Plaintiff wear a collar when she is active, and pursue a swimming exercise program, and did not recommend surgical intervention.  (Tr. 173)

Thus, there is substantial evidence to support the ALJ's conclusion that pain is not as limiting as reported when there is evidence of minimal or conservative treatment.

### 3.   *Inconsistent and unpersuasive description of symptoms*

The ALJ states as a third reason for discrediting Plaintiff, that "[t]he description of the symptoms and limitations which the claimant has provided throughout the record has generally been inconsistent and unpersuasive." (Tr. 26) Again, the ALJ failed to identify specifically what descriptions provided by the Plaintiff were inconsistent and unpersuasive. *Hollohan, supra.*

### 4.   *Medication Side Effects*

The ALJ states as another reason for rejecting Plaintiff's credibility that Plaintiff has testified that she has side effects from the use of her medications, but the treatment records show different as noted in the records obtained from Dr. Jessop.  (Tr. 26)  The Plaintiff testified at the hearing that her medications make her "sleepy and tired"; that "[e]very once in a while" she gets dizzy when she stands up, or she missteps and trips.  (Tr. 326) The medication does not cause her to have any nausea.  (Tr. 326) Plaintiff is not sure if it is the pain, the medication, or her depression which causes her to be so sleepy and tired.  (Tr. 326)

Plaintiff does experience dry mouth, and she has trouble with her memory, as a result of side effects caused by the medication.  (Tr. 326-25)

Dr. Jessop's treatment records, on the other hand, noted that Plaintiff's daily physical functioning was adequate, and that Plaintiff denied side effects from her medication.  (Tr. 225) There is substantial evidence in the record to support the ALJ's conclusion that her testimony regarding side effects from the medication is inconsistent with her treatment records.  (Tr. 26)

In sum, though the ALJ failed to support her reasons for finding Plaintiff not credible based on Plaintiff's description of daily activities and inconsistent and unpersuasive description of symptoms, the ALJ properly supported her assertions that Plaintiff's treatment has been essentially routine and/or conservative in nature, and has been generally successful in controlling her symptoms, and  that Plaintiff's testimony as to side effects differs from what the treatment records demonstrate, as noted in the records obtained from Dr. Jessop. The ALJ's properly supported assertions for finding Plaintiff not credible are supported by substantial evidence, are clear and convincing, and .

E.    Hypothetical Proposed to Vocational Expert

The testimony of a vocational expert cannot constitute substantial evidence to support an ALJ's findings if the hypothetical does not include allegations of persistent disabling pain that are supported by the medical evidence.  *Gallant v. Heckler*, 753 F.2d 1450 (9th Cir. 1984).  The ALJ proposed a hypothetical in which Plaintiff's pain, moderate in nature, is "controlled by appropriate medication without significant adverse side effects."  (Tr. 343) The vocational expert clarified, as she had with the previous hypothetical, that the ALJ intended to hypothesize that everything could be controlled with appropriate medications. (Tr. 344)

The testimony of the vocational expert in this case cannot constitute substantial evidence to support the ALJ's findings because the vocational expert's testimony in a disability benefits proceeding "is valuable only to the extent that it is supported by medical evidence."  *Gallant v. Heckler*  753 F.2d 1450, 1456 (9th Cir. 1984) (quoting *Sample v.*

*Schweiker*, 694 F.2d 639, 643-44 (9th Cir.1982)).  The hypothetical proposed to the vocational expert, whose determinations the ALJ relied on, was based on the ALJ's incorrect determination of Plaintiff's residual functional capacity ("RFC") as to the limiting effects of pain.  The ALJ determined that Plaintiff had pain in various parts of her body, which "is of moderate-level and would normally have a moderate effect on her ability to do work-related activities; however, *that pain is controlled by appropriate medication* without any significant adverse side effects."  (Tr. 26)(emphasis added)  There is no basis in the record for the ALJ to reject all of Plaintiff's allegations of pain.  Although this Court agrees that the ALJ properly discredited Dr. Jessop's ultimate opinion as to disability, over one year of treatment records from Dr. Jessop make evident that Plaintiff's pain was not "controlled" as the ALJ used that term in both her determination of the RFC and the hypothetical proposed to the vocational expert.  Dr. Jessop's treatment notes from May and June, 2004, indicate that, when she first began seeing him, her pain level was a 6 of 10, averaging 6 of 10 over her first month of treatment.  (Tr. 289) For several months after treatment, her pain increased to 7 out of 10, and Dr. Jessop responded accordingly by increasing/changing her medications.  (Tr. 264, 268, 271, 274, 278, 285) At the beginning of January, 2005, Plaintiff reported that her "good days outnumber the bad" and that her pain was a 6 out of 10.  (Tr. 260) By the end of January, 2005, Plaintiffs pain increased, and she was again at a 7 out of 10 on the pain scale, and remained at that level for another month.  (Tr. 250, 255) By the end of February, 2005, her pain level had again been reduced to a 6 out of 10, and remained at that level for another month.  (Tr. 243, 247) By April, 2005, Plaintiff was reporting pain of 4 out of 10.  (Tr. 239) In May, it again returned to 6 out of 10.  (Tr. 234) In June, Plaintiff reported an average pain level of 4 out of 10 over the last month, and in July, rising again to 5 out of 10.  (Tr. 226, 231) Finally, in the last treatment record from Dr. Jessop, she reported a pain level of 4 out of 10, with "significant intervals of pain at night."  (Tr. 224) Throughout Dr. Jessop's treatment of Plaintiff, he reported that Plaintiff "continues to do well on their current analgesic regime."  (Tr. 224-289) To the extent the ALJ interpreted this to mean that Plaintiff's pain was controlled, that statement is taken entirely out of context with the rest of

1   Dr. Jessop's treatment records which indicate a constant level of pain which from time to

2   time increases or decreases slightly, and is at best a 4 out of 10.  Furthermore, for the time

3   period for which records are available, there does not appear to be a plateau in the level of

4   pain reached by Plaintiff for a given change in her medication.  In other words, Plaintiff

5   maintained her pain level (or experienced temporary fluctuations, both higher and lower, and

6   slight in nature) at ever increasing dosages of medications.  There is no indication from the

7   record that Plaintiff reached a completely satisfactory, static condition, in which no further

8   changes in her pain medications were required.  In fact, Dr. Jessop explained to Plaintiff

9   during her initial assessment that "complete freedom from pain may not be possible" and that

10  the goal was "an improvement in daily functional ability and a decrease in pain."  (Tr. 295)

11  To the extent Plaintiff's pain was minimized, she was, in fact, doing well on her regime.

12  This did not mean, however, that she was "pain free", and this was never the goal for

13  Plaintiff with her pain treatment.

14          The assumption in the hypothetical that Plaintiff's pain "was controlled with

15  medication" is not supported by the record, and the opinion of the vocational expert is

16  therefore meaningless.  Here the vocational expert was instructed to assume that Plaintiff's

17  pain, which would have been moderate without medication, was controlled with medications

18  with no side effects.  The medical record simply does not support this.  Even with

19  medication, Plaintiff's pain was at best a 4 out of 10, and more often than not, was a 7 out

20  of 10.  This is not what the ALJ conveyed with her description of Plaintiff's pain in the

21  hypothetical.  The ALJ implied that Plaintiff had no limitations whatsoever, or at best, only

22  limitations of a slight nature, caused by her pain.  This is inconsistent with Plaintiff's

23  treatment records.

24          F.      Remand/Reverse

25          The district court has discretion to remand for further proceedings or to award

26  benefits.  *McAllister v. Sullivan*, 888 F.2d 599, 603 (9th Cir.1989).  Remand for an award of

27  benefits is appropriate where:

28          (1) the ALJ failed to provide legally sufficient reasons for rejecting the

1    evidence; (2) there are no outstanding issues that must be resolved before a

2    determination of disability can be made; and (3) it is clear from the record that

3    the ALJ would be required to find the claimant disabled were such evidence

4    credited.

5    *Benecke v. Barnhart,* 379 F.3d 587, 593, (9th Cir. 2004) (citations omitted).  Where the test

6    is met, "we will not remand solely to allow the ALJ to make specific findings...Rather we

7    take the relevant testimony to be established as true and remand for an award of benefits."

8    *Id*. (citations omitted); *see also Lester,* 81 F.3d at 834.

9         The ALJ erred in determining that Plaintiff's pain was controlled by medication.  The

10   vocational expert testified that Plaintiff would not be able to work if she experienced severe

11   pain, or pain that was only controlled by medications that resulted in side effects that were

12   so significantly adverse that they would interfere with Plaintiff's ability to maintain pace and

13   concentration.  This third hypothetical, however, does not accurately describe Plaintiff's pain

14   as reported by Dr. Jessop.

15        The fourth hypothetical included limitations regarding Plaintiff's ability to use her

16   fingers, and additional problems with muscle lumbar spasm and neck spasm.  (Tr. 345-46)

17   Additionally, the hypothetical included a number of medications Plaintiff was taking and the

18   resulting side effect of fatigue and sleepiness.  (Tr. 346) The vocational expert then assumed

19   that the fourth hypothetical was similar to the third hypothetical.  (Id.)  This assumption was

20   not accurate, however, in that the fourth hypothetical did not address Plaintiff's level of pain

21   in addition to functional limitations associated with her finger numbness and back and neck

22   spasms.  Although not entirely evident, it appears that the vocational expert adopted the

23   limitations of the third hypothetical in addition to the limitations proposed by the fourth

24   hypothetical, and thus the vocational expert was not provided an accurate depiction of

25   Plaintiff's level of pain with the use of medication.

26        The ALJ failed to provide an accurate hypothetical to the vocational expert, and thus

27   the ALJ's decision to deny benefits is not supported by substantial evidence in the record.

28   The Magistrate Judge recommends that the appropriate remedy is to remand the case to the

Commissioner of Social Security with instruction to require the ALJ to propose a hypothetical that takes into consideration the level of pain Plaintiff experiences with the use of medication, along with relevant side effects, as Dr. Jessop's treatment records indicate, taking such further evidence as is required to determine Plaintiffs eligibility for benefits under the current law, and making appropriate findings consistent with this report.

**V.   RECOMMENDATION**

For the foregoing reasons, it is the recommendation of this Court that the District Judge, after his independent review and consideration, GRANT Plaintiff's Motion for Summary Judgment (Doc. No. 10), and remand the case for further proceedings consistent with this report.

Pursuant to 28 U.S.C. §636(b), any party may serve and file written objections within ten days after being served with a copy of this Report and Recommendation.  A party may respond to another party's objections within ten days after being served with a copy thereof. Fed.R.Civ.P. 72(b).  If objections are filed, the parties should use the following case number: **CV 07-280-TUC-RCC.**

If objections are not timely filed, then the parties' right to *de novo* review by the District Court may be deemed waived.  *See United States v. Reyna-Tapia,* 328 F.3d 1114, 1121 (9th Cir.) (*en banc*).

DATED this 27th day of January, 2009.


_____
Bernardo P. Velasco
United States Magistrate Judge